# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 3, 2006

## STATE OF TENNESSEE v. MARLON MEACHAM

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-06088     James C. Beasley, Jr., Judge**

---

**No. W2005-02170-CCA-MR3-CD  - Filed April 19, 2007**

---

Following a jury trial, Defendant, Marlon Meacham, was convicted of one count of aggravated robbery and one count of aggravated burglary. Defendant was sentenced to serve nine years for the robbery conviction and six years for the burglary conviction, to be served concurrently in the Tennessee Department of Correction, for a total effective sentence of nine years. In this appeal, Defendant argues that 1) the evidence was insufficient to sustain his convictions for aggravated robbery and aggravated burglary, (2) the State improperly refreshed the recollection of Javonta Charles, and (3) the State improperly questioned Defendant about his pre-arrest silence in violation of his Fifth Amendment due process rights. After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Ross A. Sampson, Memphis, Tennessee, for the appellant, Marlon Meacham.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Scott Bearup, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Factual Background

On the evening of April 13, 2004, the victim, Kelvin Martin, was home alone watching television when Javonta Charles knocked on the door to his apartment. Mr. Charles asked Mr. Martin if he had food stamps to sell. Mr. Martin said that he did not have any food stamps. Mr. Charles then asked to use his telephone. Mr. Martin allowed Mr. Charles to use his telephone. After using the telephone, Mr. Charles left the apartment.

Shortly after Mr. Charles departed, Mr. Martin heard another knock at the door. He answered the door, and it was Mr. Charles asking to use the telephone a second time. Mr. Martin agreed to let him use the telephone. As Mr. Charles stepped inside the door, two individuals, in addition to Mr. Charles, forced their way into the apartment. The intruders were carrying guns. Mr. Martin identified Defendant as one of the intruders. Defendant was carrying a nine millimeter handgun. Mr. Martin recognized Defendant because they were roommates for approximately two months in 2002. At the time of the incident, both Defendant and Mr. Charles were staying with a friend of Mr. Martin's, Damien Baker. Mr. Martin did not recognize the third individual, but said he was carrying a shotgun.

Defendant and the man with the shotgun instructed Mr. Martin to "strip down" and get down on the living room floor. Mr. Martin was scared and afraid that the intruders were going to shoot him. Both men had their guns pointed at Mr. Martin. Defendant instructed Mr. Charles to go and look around the bedroom. Mr. Charles did as told and returned to the living room carrying a duffle bag, a shotgun, and some duct tape. Mr. Charles attempted to tape Mr. Martin into a chair. Defendant continued to stand in front of Mr. Martin, pointing his gun at him throughout this process. Mr. Martin struggled, but allowed Mr. Charles to tape his hands "to a certain extent . . . just to keep [the assailants] from shooting [him]." Defendant placed Mr. Martin's laptop computer on his lap and instructed Mr. Martin to pull up his bank account on the computer and plug in the password. Mr. Martin was not able to comply because the computer was improperly turned on and was showing an error message.

The intruders were in the apartment for approximately twenty minutes. Mr. Martin sustained injuries during the intrusion. Defendant struck Mr. Martin in the face with his pistol injuring the bridge of his nose. Mr. Martin was also kicked in the face which caused injuries to his left eye. When the intruders left the house, Mr. Martin saw them carrying his black backpack which contained several of Mr. Martin's personal belongings. Those belongings included Mr. Martin's wallet, car keys, including the key fob for his car alarm, house keys, cell phone, clothes, compact discs, and his laptop computer. Mr. Martin estimated that the items had a value of $500.00.

Mr. Martin said that following the attack, he was panicked, scared, and in pain. He waited a moment to avoid any gun fire, and then he went into the parking lot to follow the intruders. Mr. Martin saw a dark automobile leaving the parking lot, but could not see who was in the vehicle. He walked to a friend's apartment and used the telephone to call his mother. Mr. Martin told his mother he had been robbed and needed help. His mother said she could not come over until the next morning. Mr. Martin returned to his apartment, but could not sleep that night because he was afraid that one of the intruders would return to steal his car. He called the police the next morning when his mother came to his apartment. Mr. Martin subsequently went to the police station and gave his statement to a robbery detective. On April 25, 2004, Mr. Martin identified Defendant from a photographic lineup as the man who "hit me in the nose with [a] nine millimeter handgun and took my laptop."

Javonta Charles testified that he, along with Defendant and a third person, robbed Mr. Martin on April 13, 2004. Defendant was living with Mr. Charles and his roommate, Damien Baker, for one and one half months prior to the incident. On the night of the robbery, Mr. Charles suggested going to Mr. Martin's apartment to buy food stamps. Mr. Charles had purchased food stamps from Mr. Martin on prior occasions. Defendant, Mr. Charles, and a third individual drove to the victim's apartment in a black car driven by Defendant. When they arrived at the apartment, Mr. Charles knocked on Mr. Martin's door and asked Mr. Martin if he had any food stamps to sell. Mr. Martin said, "no." Mr. Charles testified that he and Mr. Martin then smoked marijuana together. He returned to the car approximately twenty minutes later. Defendant and the other passenger were waiting inside the car.

Defendant and the other individual got out of the car and told Mr. Charles to go back to the victim's apartment and knock on the door. Defendant said that he had lived with Mr. Martin and he knew that Mr. Martin "had some items" worth stealing. Mr. Charles did as instructed and the two men followed Mr. Charles to the door. One of the men was carrying a nine millimeter handgun, and the other one was carrying a duffle bag containing a sawed-off shotgun. When they entered the apartment the men told Mr. Martin to sit down. Mr. Charles was told to duct tape Mr. Martin to the chair. Mr. Charles said he did not think it was necessary to duct tape the victim, so he made a "fair attempt" and then stepped aside.

Mr. Charles was then handed the shotgun which he immediately threw on the couch. Mr. Martin leapt up and grabbed for the shotgun. Mr. Charles and Mr. Martin struggled for the gun, but the victim eventually let go. Defendant said they needed to leave the apartment because they had been there too long. The shotgun was placed back in the duffle bag before the men left the apartment. Mr. Charles recalled seeing Defendant put the lap top in the victim's lap and ask for his password, but did not see the lap top in the duffle bag. Mr. Charles also did not see Defendant hit the victim. Mr. Charles said that he did not get back in the car with Defendant and the third individual. Mr. Charles said that he got involved in the robbery to get some rent money, but did not get anything out of the robbery.

Defendant testified that he and Mr. Charles were roommates at the time of the crime. On the day of the robbery, the two men went to Mr. Martin's apartment so that Mr. Charles could buy food stamps. A third man, "T", accompanied the men to the apartment for the purpose of buying marijuana. Defendant said that he drove to the apartment and waited in the car while Mr. Charles and "T" went to the door. After waiting on the men for approximately twenty-five minutes, Defendant got out of the car and started walking toward Mr. Martin's apartment. He was almost there when the door to the apartment swung open and "T" and Mr. Charles came running out of the apartment. Mr. Martin followed the men outside and saw Defendant standing in the parking lot. Defendant said that from where he was standing, he could see that Mr. Martin had blood on his nose. Defendant followed the other two men to the car and the three men immediately left the premises. According to Defendant, Mr. Martin and "T" got into a disagreement over a drug deal, and "T" stole a quantity of marijuana from the victim. Defendant denied any involvement in the robbery and said he took no illegal action against the victim. Defendant admitted that he had previously been

convicted of a felony. He also admitted that when the police came to his apartment to question him about what happened, he gave them a false name and denied any knowledge of the robbery. Defendant said that he gave this same false name to his employer.

## II. Analysis

### A. Sufficiency of the Evidence

In his first argument, Defendant asserts that the evidence was insufficient to support his convictions for aggravated burglary and aggravated robbery because the testimony of the State's witness, Javonta Charles, was not credible. Defendant contends that Mr. Charles' testimony was not credible because he was a convicted felon, who admitted to smoking marijuana with the victim on the night of the incident, and who did not "clearly" recall the events that occurred. He further asserts that Mr. Charles' testimony is incredible because it was "bought." As part of his plea agreement and in exchange for his testimony against Defendant, the State submitted a letter to the parole board on behalf of Mr. Charles. Defendant argues that this agreement between the State and Mr. Charles violated Rule 11(d) of the Rules of Criminal Procedure concerning guilty pleas, that it violated his due process rights, and that such a violation "constitutes plain error."

Although Defendant raises his argument as a single challenge to the sufficiency of the evidence to support his convictions, in actuality, his argument raises two distinct issues. The first argument pertains to the sufficiency of the evidence to support his conviction. The second argument addresses whether his due process rights were violated by the plea agreement entered into by his co-defendant, Javonta Charles. Initially, we note that Defendant failed to raise this second issue in his motion for new trial. *See* Tenn. R. App. P. 3(e). When an issue is raised for the first time on appeal, it is typically waived. *State v. Alvarado*, 961 S.W.2d 136, 153 (Tenn. Crim. App. 1996). Nevertheless, Defendant urges this Court to find that the trial court's ruling constitutes plain error. *See* Tenn. R. Crim. P. 52(b). When a defendant raises an issue for the first time on appeal, we may address the issue in the event there was plain error on the part of the trial court. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000). However, our Court requires that on appeal, appellants present an argument, make appropriate references to the record, and cite relevant legal authority in support of their arguments. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." *See* Tenn. Ct. Crim. App. R. 10(b). Additionally, the Tennessee Rules of Appellate Procedure require the appellant's brief to contain an argument, citations to authorities, and appropriate references to the record. *See* Tenn. R. App. P. 27(a)(7). Failure to comply with these basic rules will ordinarily constitute a waiver of the issue. *See* Tenn. Ct. Crim. App. R. 10(b); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

Defendant fails to cite to any authority in support of his argument that his due process rights were violated. Nor does he cite any authority in support of his argument that the plea agreement between the State and Mr. Charles constituted "plain error." Although he makes some references to the record, those citations are not helpful in deciphering the arguments contained in his brief.

Defendant's argument consists of a conclusory statement that his due process rights were violated by the agreement, and that if such plea agreements are allowed to take place, "attorney[s] statewide could offer inducements and promises to citizens and co-defendants alike in order to secure the necessary testimony from 'witnesses' with no real personal knowledge" of the case. Under these circumstances, we are not required to review the issue of whether Defendant's due process rights were violated by the plea agreement. *See State v. Keller*, 813 S.W.2d 146, 150 (Tenn. Crim. App. 1991) ("Bald assertions unaccompanied by legal argument or citations to authorities are waived."). Nonetheless, because Defendant's issue as to the sufficiency of the evidence was properly raised, we will address that issue on the merits.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. *See State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *See Carruthers*, 35 S.W.3d at 558; *Hall*, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. *See Evans*, 108 S.W.3d at 236-37; *Carruthers*, 35 S.W.3d at 557.

Defendant was convicted of aggravated burglary, defined in pertinent part as the entry of a habitation and the commission of a theft therein. *See* T.C.A. §§ 39-14-402 and 39-14-403. Defendant was also convicted of aggravated robbery, which is defined, in relevant part, as the intentional or knowing theft of property from the person of another by violence or fear and accomplished with a deadly weapon. *See* T.C.A. §§ 39-13-401 and 39-13-402. As stated above, Defendant contends that the evidence was insufficient to support his conviction because Mr. Charles was not a credible witness. Defendant does not deny that the robbery and burglary occurred. Nor does he dispute that Mr. Martin was the victim of the crimes. Defendant argues only that the evidence was insufficient to support his conviction for these crimes because Mr. Charles was a

convicted felon, who smoked marijuana on the night of the incident, and who received a favorable plea agreement in exchange for his testimony.

Defendant's argument is essentially a request that this court re-evaluate the credibility of the State's witness, Javonta Charles. We must reiterate that questions regarding the credibility of witnesses are resolved by the trier of fact, in this case, the jury. *See Evans*, 108 S.W.3d at 236; *Bland*, 958 S.W.2d at 659. When the jury renders a verdict of guilty, all such questions have been resolved in favor of the State. *Bland*, 958 S.W.2d at 659. *Id*. The jury heard the testimony of both the State's witnesses and Defendant. Consequently, the jury heard evidence that Mr. Charles was smoking marijuana immediately prior to the crimes, that he pled guilty to aggravated robbery as a result of his role in the incident, and that in exchange for his testimony against Defendant the State wrote a letter to the parole board on his behalf. The jury also heard the victim's testimony during which he identified Defendant as one of the perpetrators who broke into his home, held him at gunpoint, beat him with the butt of the gun, and then stole his belongings. As evident by the verdict, the jury resolved all questions of credibility in favor of the State. It is not the province of this Court to overturn such determinations. Accordingly, Defendant is not entitled to relief on this issue.

## B. Use of Prior Statement to Refresh Recollection

Defendant next contends that the trial court improperly allowed the witness, Javonta Charles, to refresh his recollection by testifying from his prior statement to police and not from his actual knowledge of the events that occurred. Defendant asserts that "allowing the testimony of a witness such as Mr. Charles, one that testified that he could not actually recall the events in question from his memory, . . . constitutes plain error and should be wholly disregarded." Defendant has once again failed to cite any law or make appropriate references to the record with respect to this issue. As with his first issue, Defendant's failure to comply with the rules of appellate procedure results in a waiver of this issue. *See* Tenn. Ct. Crim. App. R. 10(b); *See* Tenn. R. App. P. 27(a)(7).

Even had Defendant complied with the rules by citing the record and relevant authority, he still would not be entitled to relief. Rule 612 of the Tennessee Rules of Evidence governs the procedure for refreshing a witness's recollection. The advisory commission comments to Rule 612 advise that "[o]nly if a witness's memory requires refreshing should a writing be used by the witness. The direct examiner should lay a foundation for necessity, show the witness the writing, take back the writing, and ask the witness to testify from refreshed memory." Tenn. R. Evid. 612, Advisory Commission Comments. In other words, to justify the use of a writing to refresh a testifying witness's recollection pursuant to Rule 612, an attorney must demonstrate that it is necessary to refresh the witness's memory and that the writing will provide the necessary refreshing. *See State v. Mathis*, 969 S.W.2d 418, 421 (Tenn. Crim. App. 1997).

Our review of the record shows that the prosecutor properly used Mr. Charles' prior statement to refresh his recollection. It is clear from the record that during direct examination, Mr. Charles did not clearly recall all of the events which occurred during the incident. When his memory failed, the State instructed Mr. Charles to read portions of his prior statement in order to refresh his

recollection and then to place the statement face down in his lap. In each instance in which his prior statement was used to refresh his recollection, Mr. Charles was able to fill the gaps in his memory of the events. The State then asked further questions based on his refreshed memory which Mr. Charles was able to answer without use of the prior statement and from his own independent memory of the events. *See State v. Carpenter*, 773 S.W.2d 1, 10 (Tenn .Crim. App. 1989); *State v. Stanley Lawson*, No. 01C01-9607-CR-00320, 1997 WL 661483, at *8 (Tenn. Crim. App., at Nashville, Oct. 24, 1997), *perm. app. denied* (Tenn. Apr. 13, 1998). This scenario is exactly the type envisioned by Rule 612. *See Mathis*, 969 S.W.2d at 421. As such, there was no error in allowing the State to refresh Mr. Charles' memory using his prior statement to police. Defendant is not entitled to relief on this issue.

## C. Impeachment of Defendant with Pre-Arrest Silence

In his final issue on appeal, Defendant contends that his due process rights were violated when the State improperly questioned him during cross-examination regarding what he failed to tell investigating officers prior to his arrest. The State counters that the evidence was admissible to impeach Defendant's testimony at trial.

During direct examination, Defendant testified that he was outside the victim's apartment when the incident occurred, he saw that the victim had blood on his nose, he saw "T" and Mr. Charles flee the residence, and he knew that "T" had stolen marijuana from the victim. Defendant denied any involvement in the robbery, with the exception of driving "T" and Mr. Charles to and from the scene. On cross-examination, the State attempted to impeach Defendant's testimony by inquiring as to why he did not tell investigating officers what he knew about the robbery when they questioned him prior to his arrest. It is this line of questioning that Defendant now objects to. Defendant cites the following portions of the record in support of his argument:

Q:     And you saw the fact that allegedly your friend T had taken a bunch of marijuana from there; is that right?

A:     Yeah. Yes.

Q:     And you didn't share that information with the police department, did you?

A:     No, I didn't know that they were in the business of protecting drug dealers. So, I'm not going - - I didn't aid in that whatsoever.

. . . .

Q:     Did you tell the police - - let me rephrase my question. You didn't tell the police that there had been some drugs - - there had been a drug transaction there, did you?

A:     No, I didn't tell them.

. . . .

> [TRIAL COUNSEL]: Your honor, I would like to object to this whole line of questioning. [Defendant] has a [c]onstitutional right to remain silent and that right to remain silent cannot be held against him. The state is asking [Defendant] questions regarding what he did not say. So I can't see how that is a proper question.

Our analysis requires a brief review of the case law applicable to situations wherein a defendant takes the stand in his own defense and is impeached with his prior silence. The United States Supreme Court has held that it is "impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation. The prosecution may not, therefore, use at trial the fact that [a defendant] stood mute or claimed his privilege in the face of accusation." *Miranda v. Arizona*, 84 U.S. 436, 468, 86 S. Ct. 1602, 1625, (1966). However, a defendant cannot use his silence to shield him from the effect of patently inconsistent testimony at trial. As such, a defendant who elects to testify at trial may be subject to "the impeaching effect of proof of any prior inconsistent statements . . . and any prior inconsistent actions." *State v. Braden*, 534 S.W.2d 657, 660 (Tenn. 1976). Nonetheless, evidence of pre-trial silence of the defendant must "be admitted with caution and then only where such silence is patently inconsistent with [the] defendant's testimony." *Id*. at 660.

In *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240 (1976), the United States Supreme Court held that a defendant who remains silent after arrest and *Miranda* warnings cannot later be impeached at trial with his silence. *Id*., at 619, 96 S. Ct. at 2245. The Supreme Court explained that "[w]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, . . . it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony." *Id*. (quoting *United States v. Hale*, 422 U.S. 171, 182-83, 95 S. Ct. 2133, 2139 (1975) (White, J., concurring)).

Subsequently, in *Jenkins v. Anderson*, 447 U.S. 231, 100 S. Ct. 2124 (1980), the Supreme Court held that due process was not violated by the impeachment use of pre-arrest, pre- *Miranda* warnings silence. In that case, the state questioned the defendant as to why he had not phoned for help or reported that he had been involved in an accidental shooting after the shooting occurred. The Court found that the questioning was not a violation of the defendant's due process rights because the silence occurred prior to his arrest, he was not in custody, and the silence was not induced by governmental action.

Two years later, in *Fletcher v. Weir*, 455 U.S. 603, 102 S. Ct. 1309 (1982), the Supreme Court held that impeachment use of post-arrest, pre -*Miranda* warnings silence does not violate due

process. In reaching this conclusion, the Supreme Court explained that *Doyle* involved silence that the government had actually induced through *Miranda* warnings, and that *Doyle* did not extend to the situation in which a defendant had not yet received *Miranda* warnings. *See id.*, 455 U.S. at 605-06, 102 S. Ct. at 1311. The caveat to *Weir*, however, was that although due process is not violated in such situations, "[a] State is entitled . . . to leave to the judge and jury under its own rules of evidence the resolution of the extent to which post[-]arrest silence may be deemed to impeach a criminal defendant's own testimony. *Weir*, at 607, 102 S. Ct. at 1312. In other words, *Weir* did not restrict states from providing more protection to defendants' post-arrest silence preceding *Miranda* warnings in those situations where state law principles necessitate such increased protection.

In the instant case, pursuant to *Jenkins v. Anderson*, no due process violation occurred when the State questioned Defendant about his pre-arrest silence. 447 U.S. at 244, 100 S. Ct. 2132. Under *Jenkins*, where there has been no arrest and no *Miranda* warnings, the state's cross-examination of the defendant regarding his silence is permissible. *See State v. Jonathan D. Rosenbalm*, No. E2002-00324-CCA-R3-CD, 2002 WL 31746708, at *6 (Tenn. Crim. App., at Knoxville, Dec. 9, 2002), *perm. app. denied* (Tenn. May 27, 2003). Defendant testified that he was not in custody at the time of his pre-arrest silence and the silence occurred three days prior to his arrest. The record does not indicate that Defendant had been arrested at the time of his silence or that *Miranda* warnings had been issued. Nor does the record indicate that Defendant invoked his *Miranda* rights in denying knowledge of the robbery. Accordingly, under the facts of this case, the State properly used Defendant's pre-arrest silence to impeach Defendant's trial testimony. Therefore, Defendant's due process rights were not violated. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
THOMAS T. WOODALL, JUDGE